CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

November 13, 2025

LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **Criminal No. 5:95-cr-70074** |
| **v.** | ) | |
| | ) | **By: Michael F. Urbanski** |
| **GREGORY A. MILTON,** | ) | **Senior United States District Judge** |
| **Defendant-Petitioner** | ) | |

## <u>MEMORANDUM OPINION</u>

This matter comes before the court on defendant Gregory A. Milton's <u>pro</u> <u>se</u> motion for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A), commonly known as a motion for "compassionate release," filed on May 6, 2024. ECF No. 463. The government filed a response on June 5, 2024. ECF No. 468. Milton has filed several replies to the response, along with supplemental authority and letters and comments in support of his motion. ECF Nos. 469–480, 485, 487, 492. Milton's motion rests on two developments in federal sentencing law that occurred after he was sentenced, which he asks the court to consider along with the sentencing disparity concerning one of his codefendants, and evidence of his rehabilitation during the 30 years he has spent incarcerated. As set forth below, the court concludes that Milton has demonstrated extraordinary and compelling reasons warranting a sentence reduction, and that such a reduction is consistent with the 18 U.S.C. § 3553(a) factors. Although the violent nature of Milton's crime still merits a severe sentence, the court finds that a reduction of his current life sentence to 470 months will better serve the interests of justice. Accordingly, the court **GRANTS** Milton's motion and reduces his sentence to 470 months.

## I. Background

On June 13, 1996, a jury found defendant Milton guilty of three crimes: conspiracy to distribute crack cocaine in violation of 21 U.S.C. § 841 (Count One), Hobbs Act robbery in violation of 18 U.S.C. § 1951 (Count Three), and use of a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c) and (i) (Count Four). The jury acquitted Milton of using or carrying a firearm and causing the death of Ian Byron-Cox in relation to a drug trafficking crime (Count Two). Third Superseding Indictment, ECF No. 94-1 at 3; Jury Verdict, ECF No. 162. On October 31, 1996, the court sentenced Milton to concurrent life sentences on Counts One and Three and a consecutive life sentence on Count Four, to be followed by a 5-year term of supervised release. J., ECF No. 197. These convictions arose out of the drug related robbery and murder of Ian Byron-Cox on March 13, 1995. Third Superseding Indictment, ECF No. 94-1.

At trial, testimony established that Byron-Cox led a conspiracy to distribute crack cocaine from New York to Waynesboro, Virginia. Milton participated in the conspiracy by transporting and selling cocaine. A dispute developed between Milton and Byron-Cox regarding payment for drugs, and Milton stopped working for Byron-Cox. Sometime later, Milton asked John Waller, another member of the conspiracy and later a codefendant, to obtain a gun for him. Milton then traveled to Waynesboro, where Byron-Cox was staying, and aided by Waller and another codefendant, Derek Yancey, broke into Byron-Cox's house. Milton awakened Byron-Cox and his girlfriend, Carolyn Chapman, beat Byron-Cox, bound and blindfolded Chapman, took money and property from the home and speakers from Byron-Cox's car, and shot Byron-Cox in the back. Chapman testified that although she was

2

partially blindfolded, she saw Milton shoot Byron-Cox. Witnesses testified that Milton, Waller, and Yancey believed that there would be a significant amount of money in the house due to Cox's recent drug sales, and that while Milton was beating Cox, he made statements to the effect that Cox should have paid Milton the money Cox owed him. Milton maintained throughout the proceedings and in his appeal and post-conviction motions that Waller, rather than he, was the shooter.[1]

On April 20, 2021, following a motion for relief filed pursuant to 28 U.S.C. § 2255, ECF No. 335, as amended by ECF No. 364, and a motion for relief under the First Step Act of 2018 (FSA), ECF No. 383, the court reduced Milton's sentences on Counts One and Three from life imprisonment to 20 years, but left in place his consecutive life sentence on Count Four. Mem. Op., and Order, ECF Nos. 425, 426. Milton is now back before the court, arguing that he is entitled to a reduction of the life sentence on Count Four.

On Count Four, Milton was found guilty of violating 18 U.S.C. §§ 924(c) and 924(j)(1) and (2). J., ECF No. 197.[2],[3] A conviction under § 924(j)(1) carries a sentence of any term of

---

[1] Codefendant Yancey was tried by a jury and acquitted. ECF Nos. 245, 254. Codefendant Waller pled guilty to three counts related to the drug conspiracy and murder and was sentenced to 320 months. ECF Nos. 65, 252.

[2] The judgment states that Milton was convicted under § 924(i)(1) and (2). Subsection 924(i) was redesignated as subsection (j) in 1996. See Pub. L. No. 104–294, § Sec. 603(r); 110 Stat. 3505 (1996).

[3] In the Memorandum Opinion issued on April 20, 2021, the court addressed whether Milton's conviction for Hobbs Act robbery and his New York state convictions were valid predicates for purposes of imposing the "three strikes" mandatory life enhancement found in 18 U.S.C. § 3559(c)(1). Mem. Op., ECF No. 425 at 18–20. The court concluded that the § 924(c) conviction on Count Four and the New York convictions for first degree robbery qualified as serious violent felonies under § 18 U.S.C. § 3559(c)(2)(F)(1) and that the three strikes rule mandated that Milton be sentenced to life. Id. at 20. When the Fourth Circuit Court of Appeals affirmed the decision, it stated that "the record conclusively establishes that the mandatory, consecutive life sentence imposed on Milton's 18 U.S.C. § 924(c) conviction resulted from application of then-operative 18 U.S.C. § 924(i)(1)—not the challenged designation under 18 U.S.C. § 3559(c)." United States v. Milton, No. 21-7316, 2022 WL 2355508, at n.* (4th Cir. 2022), located herein at ECF No. 447. Therefore, in this opinion, the court does not discuss any effect that § 3559(c) might have on the outcome of Milton's pending motion for compassionate release.

years or for life and most courts, including courts in the Fourth Circuit, believed that the sentence had to be imposed consecutively to any other sentence. Pre-Sentence Investigation Report (PSR), ECF No. 456 ¶ 64; J., ECF No. 197 at 5. Milton's base offense level was 43, based on United States Sentencing Guidelines (USSG or guidelines) § 2D1.1(d)(1), which provided that if a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111, the First Degree Murder Guideline, § 2A1.1, was to be applied. Milton's base offense level was increased by 2 points because the victim was restrained, and by 2 more points for his role as a leader, giving him a total offense level of 47. PSR, ECF No. 456 ¶¶ 17–37. Milton had a criminal history score of 10 increased by two points because he was on parole at the time he committed the instant offense, and by an additional point for having committed the instant offense less than 2 years after being released from prison on a robbery conviction, giving him a total criminal history score of 13 and a criminal history category of VI. His offense level of 47 gave him a guidelines sentence of life, regardless of his criminal history score. USSG Ch. 5 Pt. A. At the time Milton was sentenced, guidelines sentences were mandatory. The court sentenced Milton to a consecutive sentence of life on Count Four, which it noted met "both statutory and guideline requirements." J., ECF No. 197 at 5.

Milton seeks compassionate release based on his contention that if he were sentenced today, any sentence assessed on the § 924(j)(1) conviction no longer would be required to be imposed consecutively, and, because the sentencing guidelines are no longer mandatory, it is likely that he would have received a sentence shorter than life imprisonment. He also argues that there is a gross disparity between the sentence he received and the sentence his codefendant Waller received for the murder of Byron-Cox. In addition, he argues that his

4

extensive rehabilitation, when considered along with the likelihood that he would receive a much shorter sentence today, serves as an additional basis for a sentence reduction. Finally, Milton argues that the 18 U.S.C. § 3553(a) factors weigh in favor of a sentence reduction. The government responds that (1) the Commission exceeded its authority when it promulgated USSG § 1B1.13(b)(6); (2) even if the Commission did not exceed its authority, Milton cannot establish that the sentence he received is unusually long or grossly disparate to the sentence he might receive today; and (3) the 18 U.S.C. § 3553(a) factors weigh against granting compassionate release to Milton.

## II. Analysis

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the FSA, authorizes courts to modify terms of imprisonment as follows:

> The court may not modify a term of imprisonment once it has been imposed except that—in any case—the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Accordingly, Milton's requested relief requires the court to consider (1) if he exhausted his administrative remedies; (2) if so, whether there are extraordinary and compelling reasons that

5

warrant a reduction in his sentence; and (3) if so, what, if any, sentence reduction is appropriate after considering the applicable 18 U.S.C. § 3553(a) factors.

## A. Exhaustion

The exhaustion requirement, which is non-jurisdictional, is "satisfied if a defendant requests the Bureau of Prisons to bring a motion [for compassionate release] on their behalf and either fully exhausts all administrative rights to appeal the Bureau's decision or waits 30 days from the date of their initial request to file a motion in the district court." United States v. Muhammad, 16 F. 4th 126, 129–31 (4th Cir. 2021). On November 15, 2023, Milton asked the warden of his facility to file a motion for compassionate release on his behalf and did not receive a response. Milton then waited more than 30 days to file his motion for relief. ECF No. 463-2 at 3–4. The government does not contest that Milton exhausted his administrative remedies and the court finds that he did so.

## B. Extraordinary and Compelling Reason

Regarding whether Milton has established an extraordinary and compelling reason for a sentence reduction, prior to enactment of the FSA, only the Bureau of Prisons could file a motion for compassionate release on behalf of an inmate. United States v. High, 997 F.3d 181, 185 (4th Cir. 2021) (citing 18 U.S.C. § 3582(c)(1)(A) (2002)). The FSA, among other changes, amended § 3582(c)(1)(A) to allow inmates to file motions with a district court on their own behalf after exhausting their administrative remedies.

The statute also requires that any reduction based on an extraordinary and compelling reason be consistent with applicable policy statements issued by the United States Sentencing Commission (the Commission). But, prior to March 2023, there were no "applicable policy

statements" to reference, because the Commission lacked a quorum and could not act. <u>See</u> <u>discussion</u>, <u>United States v. McCoy</u>, 981 F.3d 271, 280–84 (4th Cir. 2020).[4] In the absence of applicable policy statements, courts looked to relevant sentencing guidelines provisions to determine whether a motion presented an extraordinary and compelling reason warranting a sentence reduction. <u>United States v. Davis</u>, 99 F.4th 647, 654 (4th Cir. 2024). Courts in the Fourth Circuit (and other circuits) held that a change in law that resulted in a gross disparity between the sentence a defendant received and the sentence that he likely would receive were he convicted today could be an extraordinary and compelling reason warranting a sentence reduction. <u>See</u> <u>McCoy</u>, 981 F.3d at 286, and the cases that followed it.

In May 2023, the Commission achieved a quorum and adopted revised guidelines that became effective November 1, 2023. Included in the revisions were policy statements addressing motions for sentence reduction under 18 U.S.C. § 3582(c)(1)(A) when a defendant alleges that "extraordinary and compelling" reasons warrant a reduction. <u>See</u> U.S. SENT'G COMM'N, GUIDELINES MANUAL § 1B1.13 (Nov. 2023). The policy statement in the revised guidelines now provides in USSG § 1B1.13(b) that an "extraordinary and compelling" reason warranting compassionate release can exist under any of the following circumstances, each of which includes detailed requirements and caveats:

(1) Medical Circumstances of the Defendant.

(2) Age of the Defendant.

(3) Family Circumstances of the Defendant.

---

[4] <u>See</u> <u>also</u> U.S. Sentencing Comm'n Annual Report 2–3 (2019) https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2019/2019-Annual-Report.pdf.

(4) Victim of Abuse.

(5) Other reasons.

(6) Unusually Long Sentence.

**(1) Sentencing Commission's Authority to Promulgate USSG § 1B1.13(b)(6)**.

Before addressing Milton's arguments on the merits, the government argues that the Commission exceeded its authority when it amended the policy statement at USSG §§ 1B1.13(b)(6), and that the policy statement is at odds with 18 U.S.C. § 3582(c)(1)(A)'s plain text, context, and purpose, and also that it is in tension with the doctrine of separation of powers. However, these arguments are foreclosed by the Fourth Circuit's decision in Davis and the Supreme Court's decision in Concepcion v. United States, 597 U.S. 481, 487 (2022).

In Davis, the Fourth Circuit held that a change in case law can constitute an extraordinary and compelling reason for compassionate release. The court first quoted McCoy, 981 F.3d at 287 (cleaned up), for its statement that "the very purpose of § 3582(c)(1)(A) is to provide a safety valve that allows for sentence reductions where there is not a specific statute that already affords relief but extraordinary and compelling reasons nevertheless justify a reduction." Davis, 99 F.4th at 657. The court next quoted Concepcion, 597 U.S. at 487, which held that "[b]ecause district courts are always obligated to consider the nonfrivolous arguments presented by the parties, the First Step Act requires district courts to consider intervening changes when parties raise them." Davis, 99 F.4th at 657. The court concluded that Concepcion and the Commission's policy statement in § 1B1.13(b)(6) "serve to confirm and amplify" the court's earlier ruling in McCoy that "[n]on-retroactive changes in law remain

relevant when a court has to decide when and how to modify a sentence," and a court abuses its discretion when it fails to do so. Id. at 658.

Although the Fourth Circuit did not parse the language of § 1B1.13(b)(6) in connection with 18 U.S.C. § 3582(c)(1)(A), given the court's unequivocal holding that non-retroactive changes in the law may warrant compassionate release, this court has no basis for finding that the Commission exceeded its authority when it promulgated USSG § 1B1.13(b)(6), that the policy statement is at odds with 18 U.S.C. § 3582(c)(1)(A)'s plain text, context, and purpose, or that it creates tension between the legislative and executive branches of government such that the court should not follow it. See also United States v. Spencer, No. 2:11-cr-30, 2025 WL 572398, at *4 (E.D. Va. Feb. 13, 2025) (finding government's argument that the Commission exceeded its authority when it promulgated § 1B1.13(b)(6) unpersuasive and unsupported by established precedent); United States v. Powell, No. 5:17-CR-00169-M-2, 2024 WL 4778029 at *3, n.1 (E.D.N.C. Nov. 13, 2024) (rejecting argument that the Commission exceeded its statutory authority based on Concepcion and Davis); and United States v. Dire, No. 2:10cr56, 2024 WL 4259871, at *3 n.3 (E.D. Va. Sept. 20, 2024) (rejecting argument by government that the Commission exceeded its authority when it authorized district courts to consider non-retroactive statutory amendments as a basis for compassionate release); see also United States v. Berry, Nos. 1:05-CR-118, 1:05-CR-119, 2024 WL 4466828 (M.D.N.C Oct. 10, 2024) (finding without discussion of whether the Commission exceeded its authority that a sentence reduction was consistent with § 1B1.13(b)(6) based on intervening changes to 18 U.S.C. § 924(c) and the sheer length of the defendant's sentence).

The court finds that §§ 1B1.13(b)(6) and (c) of the guidelines are consistent with 18 U.S.C. § 3582(c)(1)(A) and 28 U.S.C. § 994(t). The Commission did not exceed its authority when it amended the policy statement, and the court will apply the Commission's interpretation of what constitutes an extraordinary and compelling circumstance warranting a sentence reduction to Milton's case.

### (2) Unusually Long Sentence

Milton is serving a life sentence, imposed consecutively to the other sentences imposed at the time he was convicted. He argues that his sentence is unusually long, and after the Supreme Court issued its decision in <u>Lora v. United States</u>, 599 U.S. 453 (2023), courts no longer are required to impose sentences for violation of 18 U.S.C. § 924(j)(1) consecutively to any other sentence. He also argues that after <u>United States v. Booker</u>, 543 U.S. 220 (2005), the guidelines are no longer mandatory, and if he were sentenced today, these cases considered together make it likely would receive a much shorter sentence than life imprisonment. Milton argues that the difference between the sentence he currently is serving and the sentence he likely would receive today is a gross disparity that warrants compassionate release.

The policy statement provides that a defendant is eligible for a sentence reduction if he can show the following:

> (6) Unusually Long Sentence.--If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

(c) Limitation on Changes in Law.--Except as provided in
subsection (b)(6), a change in the law (including an amendment
to the Guidelines Manual that has not been made retroactive)
shall not be considered for purposes of determining whether an
extraordinary and compelling reason exists under this policy
statement. However, if a defendant otherwise establishes that
extraordinary and compelling reasons warrant a sentence
reduction under this policy statement, a change in the law
(including an amendment to the Guidelines Manual that has not
been made retroactive) may be considered for purposes of
determining the extent of any such reduction.

USSG §§ 1B1.13(b)(6) and (c).

The government argues that Milton's life sentence is neither unusual nor grossly

disparate to the sentence he would receive today. The Commission did not define "unusually

long sentence," and there is "considerable uncertainty" about when a sentence should be

considered "unusually long." United States v. Howard, No. ELH-13-0629, 2024 WL 112010,

at *15 (D. Md. Jan. 10, 2024). There does not even appear to be a consensus among courts

about the yardstick to be used in assessing whether a sentence is "unusually long."

Some courts compare a defendant's sentence to other federal sentences as a whole and

to sentences for offenses like the one committed by the defendant. In Howard, 2024 WL

112010 at *15, the court construed "unusually long" in the manner most favorable to the

defendant and found a sentence "unusually long" if it is "significantly longer than the average

of all sentences imposed nationwide in a given year." The court then found the defendant's

235-month sentence for robbery and firearm offenses was unusually long compared to the

2022 nationwide average sentence of 51 months. Id. at *16. In United States v. Lespier, No.

3:98-CR-102 (SVN), 2025 WL 213732, at *3 (D. Conn. Jan. 16, 2025), the court found a life

sentence for murder in aid of racketeering to be unusually long compared to all federal

sentences and also compared to the national mean for murder sentences, 285 months in 2023, and the median for murder sentences, 276 months in 2023. In United States v. Evans, 759 F.Supp.3d 1247, 1262 (S.D. Fla., 2024), the court found "it can hardly be doubted" that defendant's sentence of 595 months for drug, firearm, and witness intimidation was "unusually long" because only 11.9 percent of federal sentences were longer than 120 months, the average federal sentence was 45 months, and the average murder sentence was 265 months.

Other courts compare the sentence to the applicable guideline sentence. In United States v. Millner, No. JKB-08-0086, 2024 WL 1678559, at *3 (D. Md. Apr. 18, 2024), the court determined that a 240-month sentence was not unusually long because it was at the low end of the guidelines range. In United States v. Locust, Criminal No. 4:06-cr-40-1, 2025 WL 880148 (E.D. Va. March 21, 2025), the court found that a life sentence, although no longer statutorily mandatory and less common than it was when defendant was sentenced in 2006, was within defendant's adjusted guidelines range, and thus not "unusually long."

Still other courts compare the defendant's original sentence to the sentence he would receive under current law. In Reed v. United States, No. 4:96-cr-22-3, 2024 WL 3153221, at *5 (E.D. Va. June 24, 2024), the court stated, "[c]onsidering Petitioner's total sentence of 65 years and the 15-year disparity caused by § 924(c) stacking, the Court finds that Petitioner's sentence is unusually long and there is a 'gross disparity' between [Petitioner's] sentence and the sentence Congress now believes to be an appropriate penalty for his conduct." (internal citations omitted). Similarly, in United States v. Ware, 720 F.Supp.3d 1351, 1362–63 (N.D. Ga. 2024), the court assessed a 55-year sentence as unusually long when compared to the 31-year sentence the defendant would receive under current law.

12

Finally, some courts take an intuitive approach and subjectively reason that a sentence is unusually long.  See United States v. Crenshaw, No. 2:90cr117, 2025 WL 618869, at *6 (E.D. Va. Feb. 26, 2025) (finding "55-year sentence is surely 'unusually long.'").

The court finds that by most of these measures, Milton's life sentence is unusually long. In 2024, the mean federal sentence was 52 months and the median sentence was 24 months. The mean sentence for murder was 274 months and the median sentence was 240 months. U.S. Sentencing Commission, 2024 Datafile, USSCFY24, Table 7.[5] In the Fourth Circuit in 2024, the mean sentence for murder was 273 months and the median sentence was 300 months. Id. Milton's life sentence is unusually long compared to the 2024 overall mean and median sentences, the mean and median sentences for murder, and the mean and median sentences for murder in the Fourth Circuit.

Looking at historical trends, in fiscal year 1995, while the mean and median sentences for murder were 252.3 months and 210 months, respectively, the mean and median sentences for murder in the Fourth Circuit were 357.4 months and 420 months, respectively. U.S. Sentencing Commission, 1995 Datafile, MONFY95, Table 7.[6] Thus, sentences for murder overall were slightly lower in 1995 at the national level, but in the Fourth Circuit, the mean murder sentence was approximately 24 percent higher than it is today and the median sentence was approximately 28 percent higher. In addition, in fiscal year 1995 in the Fourth Circuit, both the mean and median sentences for murder were higher than in any other circuit. The

---

[5] https://www.ussc.gov/research/data-reports/geography/2024-federal-sentencing-statistics (last viewed October 22, 2025).

[6] https://www.ussc.gov/research/data-reports/geography/1995-federal-sentencing-statistics (last viewed October 22, 2025).

next highest sentences for murder were assessed in the Eighth Circuit, with a mean sentence of 283.1 months and a median sentence of 264 months. Id. Comparing Milton's life sentence to the average and median sentences from 1995 as well as the sentences imposed today leads the court to conclude that his sentence was unusually long in 1995 and is even more so today. Finally, a sentence of life, the longest possible sentence aside from the death penalty, "is surely 'unusually long.'" Crenshaw, 2025 WL 618869, at *6.

Accordingly, the court finds that Milton's life sentence is unusually long. In addition, Milton has served more than 10 years of his term of imprisonment and thus meets the first criteria for a reduction under § 1B1.13(b)(6).

### (3) Effect of Lora

Regarding whether a change in the law has occurred that produces a gross disparity between Milton's original sentence and the sentence he would receive today, Milton argues that the change brought about by the Supreme Court decision in Lora has effected just such a change. The court sentenced Milton to a mandatory life sentence on Count Four. In the PSR it was noted that "[t]he maximum term of imprisonment for Count Four is a mandatory sentence of any term of years or for life to be served consecutive to any other term of imprisonment to be imposed," citing 18 U.S.C. § 924(i)(1). The court adopted the factual findings and guideline application in the presentence report. J., ECF No. 197 at 5.

Section 924(j)(1), (previously Section 924(i)(1)), reads as follows:

> A person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall—
> (1) if the killing is a murder (as defined in section 1111), be punished by death or imprisonment for any term of years or for life[.]

14

Subsection (c) sets forth the punishment for use of a firearm during and in relation to a crime of violence or a drug-trafficking crime, with sentences varying based on the type of firearm and whether the firearm was used, brandished, or discharged. 18 U.S.C. § 924(c)(1). The statute provides that "no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence or drug trafficking crime during which the firearm was used, carried, or possessed." 18 U.S.C. § 924(c)(1)(D)(ii).

Prior to the Supreme Court decision in Lora, many courts, including courts in the Fourth Circuit, read the two statutes together to mean that any sentence imposed for violation of § 924(j) had to run consecutively to any other term of imprisonment imposed. See, e.g., United States v. Bran, 776 F.3d 276, 280–82 (4th Cir. 2015) (holding that imposition of consecutive sentences for violation of § 924(j) was mandatory under the statute). However, this reading of the statute was not unanimous among the circuits and in Lora, the Court resolved the circuit split and held that the consecutive-sentence mandate in § 924(c)(1)(D)(ii) does not apply to § 924(j) sentences. Lora, 599 U.S. at 463–64. Rather, the district court has discretion to impose a sentence under § 924(j) concurrently with another sentence. Id. at 64.

Milton argues that if he were sentenced today, the court likely would impose a concurrent sentence on Count Four rather than a consecutive sentence. However, even assuming this is true, applying Lora by itself does not mean that there is a gross disparity between the sentence he received in 1996 and the sentence he would receive today. As the government points out, a sentence of life in prison is a sentence of life in prison, regardless of whether it is imposed concurrently with or consecutive to another sentence. In other words,

even if the court had imposed the life sentence concurrently with the 20-year sentences Milton has completed on Counts One and Three, Milton still would be serving a life sentence.

The government's reasoning is sound as far as it goes. However, when the effect of Lora is considered in tandem with the effect of the Supreme Court decision in Booker, it appears likely that Milton would be sentenced to a shorter sentence today.

**(4) Guidelines Sentences Pre- and Post-Booker.**

In Booker, 543 U.S. at 245, the Supreme Court held that the guidelines are advisory in nature, rather than mandatory. A court must consider the guidelines ranges but is permitted to tailor a sentence in light of other statutory concerns. Id. at 757 (citing 18 U.S.C. § 3553(a)). At the time Booker was decided, it applied to cases on direct review, but not to cases on collateral review. United States v. Morris, 429 F.3d 65, 72 (4th Cir. 2005).[7]

Neither the Supreme Court nor the Fourth Circuit has addressed whether the change in the application of the sentencing guidelines brought about by Booker can be considered a "change in the law" for purposes of determining whether a defendant presents an extraordinary and compelling reason for a sentence reduction under § 1B1.13(b)(6).[8] However, a few district courts in the Fourth Circuit have found that Booker can be considered a factor in a motion for compassionate release along with other factors. See United States v. Wesley, No. 1:97-cr-382-2, 2025 WL 2623449, at *5 (E.D. Va. Sept. 11, 2025) (reducing sentence based

---

[7] In Jones v. United States, 431 F.Supp.3d 740, 743 (E.D. Va. 2020), the decisions by the Courts of Appeal that Booker is not retroactively applicable on collateral review prompted the district court to comment that the decisions "created a lost generation, a group caught in national purgatory, where individual citizens pay penance for the constitutional errors of the sovereign."

[8] The Sixth and Seventh Circuits have held that the imposition of a pre-Booker sentence cannot serve as a ground for a sentence reduction. See United States v. Hunter, 12 F.4th 555 (6th Cir. 2021); United States v. Williams, 65 F.4th 343 (7th Cir. 2023).

in part on conclusion that after examining relevant empirical data and the record in the case, if defendant had been sentenced post-Booker, he would have received a sentence shorter than that assessed 30 years previously); United States v. Coleman Johnson, No. 3:00-cr-00026, 2025 WL 233586 (W.D. Va. Jan. 17, 2025) (Moon, J.) (noting that "district courts within the Fourth Circuit have held that Booker may be considered an intervening change in the law that constitutes 'extraordinary and compelling' circumstances."); United States v. Shaheem Johnson, No. 1:97-cr-314-AJT, 2023 WL 5049267, at *8 (E.D. Va. Aug. 24, 2024) (stating first that the court could "find little jurisprudential reason not to consider Booker in determining whether extraordinary and compelling reasons exist," and then that, in light of confusion about whether the defendant was sentenced based on a statutory minimum sentence or a guidelines sentence, the court would consider the "underlying doctrinal sentiments in Booker as a consideration, not a standalone justification, for whether extraordinary and compelling reasons exist to reduce [defendant's] sentence") aff'd 143 F.4th 212 (4th Cir. 2025); and United States v. Browning, No. 2:98-00134, 2022 WL 1787133, at *4 n.7 (S.D.W.V. June 1, 2022) ("The Fourth Circuit has not explicitly held that pre-Booker sentences cannot be a factor for compassionate release. Indeed, given the discretion granted to courts in McCoy and Kibble, the court believes it is permitted to consider this nonretroactive change in sentencing law as a factor for release under § 3582"); see also United States v. Scruggs, No. 3:99cr200, 2021 WL 3115819 (E.D. Va. July 22, 2021) ("Scruggs asserts that, and correctly so, following [Booker], the approach to federal sentencing has undergone substantial change and that Scruggs likely would not be sentenced today as he was in 2003.")

The court agrees that there is no jurisprudential reason not to consider the effect of Booker when determining whether a gross disparity exists between the sentence Milton received in 1996 and the sentence he likely would receive today. However, the extent of a potential disparity is not as easy to calculate in the context of Booker as it is in some of the other situations where courts have found a gross disparity in sentencing. For example, in McCoy (decided prior to enactment of § 1B1.13(b)(6) but still illustrative), the court addressed the effect of "unstacking" sentences for consecutive violations of 18 U.S.C. § 924(c) brought about by the First Step Act of 2018. Prior to the First Step Act, courts were required to impose two statutory mandatory sentences, which for McCoy, totaled 32 years. McCoy, 981 F.3d at 277. After the First Step Act, the same offenses were punishable by a sentence of 12 years, and the gross disparity between the sentences was apparent.

The same is true of compassionate release motions based on case law addressing whether a previous conviction for a conspiracy offense qualifies as a predicate offense for purposes of the career offender guideline, USSG § 4B1.2. In United States v. Norman, 935 F.3d 232 (4th Cir. 2019), the Fourth Circuit determined that convictions for conspiracy to distribute drugs no longer could be considered controlled substance offenses under USSG § 4B1.2. This court and many others have found a gross disparity in sentences when considering the difference between the sentence a defendant received as a career offender pre-Norman and the sentence he would have received post-Norman without the career offender designation. In those cases, the court can calculate the difference based on the record of the case. See, e.g., United States v. Dickerson, No. 7:10-cr-00011, 2023 WL 7006504 (W.D. Va.

Oct. 24, 2023) (calculating difference between pre-Norman guidelines sentencing range as 262 to 327 months and post-Norman guidelines range as 151 to 188 months).

Assessing what a sentence would likely be today in the post-Booker era is not as straightforward. As the court pointed out in Coleman Johnson, 2025 WL 233586 at *5, in most cases, the guidelines sentence will not have changed. In Milton's case, his guidelines sentence, based on his total offense level of 47 and his criminal history category of VI, remains life in prison. USSG § Ch. 5 Pt. A. The only thing that has changed is the mandatory nature of the sentence. Under these circumstances, the Coleman Johnson court found that "where [the defendant] is serving a sentence that continues to fall within the current guidelines range, the Court is hard-pressed to conclude that [the defendant] faces a gross disparity in sentencing outcomes that justifies compassionate release." Coleman Johnson, 2025 WL 233586 at *5. Nevertheless, the court considered but rejected the defendant's arguments that he would receive a shorter sentence today based on issues he claimed were not considered at trial because of the mandatory nature of the pre-Booker sentence. Id. at 6.

The court also noted that according to statistics produced by the Commission, between 2019 and 2023, 48 percent of defendants with the same total offense level and criminal history category as the defendant (Criminal History Category I and Total Offense Level 43) were sentenced within the guideline range while only 32 percent of similarly situated individuals had a downward departure or variance without a 5K1.1 Substantial Assistance motion. Id. at *6 (citing data obtained from the Sentencing Commission's Judiciary Sentencing Information platform). The mean sentence was 415 months and the median sentence was 470 months. The defendant's guidelines range was life and he was sentenced to life. At the time he filed his

motion, he had served approximately 288 months, id. at *3, 6, and the court noted that this number was below the mean and median sentence. It concluded that this factor, among others, undermined the defendant's argument that he was entitled to a sentence reduction. Id. at *6.

The court also relied on the fact that the statutory sentence had not changed to find that the defendant had not met his burden of showing that there was a gross disparity between the defendant's original sentence and the sentence that would be imposed today. The court concluded: "While the Court was originally required to sentence Johnson to life imprisonment based on the jury's verdict and the mandatory Guidelines range of life imprisonment, the Court would issue the same sentence today under the now-advisory Guidelines." Id.

Milton's case is distinguishable in that in his case, the statutory sentence is no longer required to be applied consecutively after Lora, and because Milton has served more than 30 years of his sentence. When trying to determine what sentence Milton likely would receive were he sentenced for the same offense today as he was in 1996, the court notes that for fiscal years 2020 through 2024, there were 70 defendants reported to the Sentencing Commission whose sentencing factors were similar to Milton's with the primary guideline being § 2A1.1, a total offense level of 47, and a criminal history category of VI. Excluding defendants who received a § 5K1.1 substantial assistance departure, 59 percent of the defendants received a guidelines sentence, and 24 percent of defendants received a downward departure or variance. The mean length of imprisonment was 405 months and the median length of imprisonment was 470 months.[9]

---

[9]    United States Sentencing Commission, Judiciary Sentencing Information (JSIN) https://jsin.ussc.gov/analytics/saw.dll?Dashboard (last viewed October 22, 2025).

Although the methodology is imperfect because it is based on mean and median sentences pre- and post-<u>Booker</u>, rather than on a change to a more easily measurable metric, the court nevertheless finds that if sentenced today, with a guidelines sentence of life no longer mandatory, it is likely that Milton would be sentenced to a term of 405 to 470 months. In addition, the court finds that after <u>Lora</u>, it is likely that the court would impose the sentence concurrently rather than consecutively to Milton's two other sentences.

The court acknowledges that for purposes of calculating average sentences, the Sentencing Commission counts sentences of 470 months or greater, including life sentences, as sentences of 470 months, "a length consistent with the average life expectancy of federal criminal defendants given the average age of federal defendants."[10] While some of the sentences used to calculate the mean and median sentences of 405 and 470 months were undoubtedly life sentences, the court nevertheless finds that in considering Milton's "individualized circumstances," USSG §§ 1B1.13(b)(6), and the post-conviction evidence specific to his case, a gross disparity exists between the life sentence he received in 1996 and the sentence he likely would receive today, and that this disparity presents an extraordinary and compelling reason for a sentence reduction.

### (5) Disparate Sentences Under USSG § 1B1.13(5)[11]

In assessing Milton's motion for compassionate release, this court also must consider the Fourth Circuit's recent decision in <u>United States v. Johnson</u>, 143 F.4th 212 (4th Cir. 2025),

---

[10] <u>Id.</u>

[11] The revised policy statement at USSG § 1B1.13(b)(5) provides that an extraordinary and compelling reason exists if the defendant presents any other circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4).

where the Fourth Circuit held that USSG § 1B1.13(b)(5) gives a district court discretion to reduce a sentence on the basis that a defendant's sentence was significantly longer than that of his codefendants convicted of similar offenses. In <u>Johnson</u>, the defendant was involved in a multi-state drug-trafficking enterprise during the 1990s. While participating in the enterprise, Johnson was responsible for the deaths of two people, as were three of his codefendants. <u>Id.</u> at 213. Johnson elected to go to trial on the charges related to the two murders, as well as on firearms and related charges. He was convicted of voluntary manslaughter in one of the deaths, aiding and abetting in the murder of another of the victims, and two firearm offenses. Johnson was sentenced to two terms of life imprisonment plus 790 months. <u>Id.</u> at 213–14.

After Johnson was convicted, two of Johnson's codefendants pled guilty and assisted the government. One of the codefendants pled guilty to one count of murder for which he received a mandatory life sentence, with the sentence later being reduced to a term of 20 years. A second codefendant pled guilty to charges related to the killing of two people and received two mandatory life sentences, later reduced to a total of 40 years. <u>Id.</u> at 214. A third person involved in the conspiracy was arrested in another jurisdiction. He pled guilty to conspiracy to commit murder for hire, murder for hire, three firearm counts, two counts of Hobbs Act robbery, and one count of making false statements. He also testified against Johnson. <u>Id.</u> The third codefendant was sentenced to a term of 5 years. <u>Id.</u>

Johnson argued that the disparities in the sentence that he received compared to that of his codefendants constituted an extraordinary and compelling reason for a sentence reduction. <u>Id.</u> The district court agreed for the reasons cited by Johnson as well as for other reasons, and reduced Johnson's sentence to 35 years. <u>Id.</u> at 215.

On appeal, the Fourth Circuit affirmed the district court:

> In determining whether an extraordinary and compelling reason exists to grant a defendant compassionate release, and in addition to the various circumstances outlined in § 1B1.13(b), § 1B1.13(b) allows a district court to contemplate "other reasons" that may constitute "extraordinary and compelling." § 1B1.13(b)(5). A district court may consider this reason by itself or in combination with any other reasons outlined in § 1B1.13(b), so long as they "are similar in gravity[.]" § 1B1.13(b)(5). In other words, there is no exhaustive list as to what may be considered extraordinary and compelling, and it was well within the district court's discretion to find "other reasons," such as Johnson's sentencing disparity, constituted an extraordinary and compelling factor that weighed in favor of granting relief.

Id. at 216.

Like Johnson, Milton argues that the sentence he received was much longer than that of his codefendant Waller, although they were convicted of similar offenses, and the difference in the sentences warrants a sentence reduction for him. Waller pled guilty to one count of conspiracy to distribute a controlled substance in violation of 21 U.S.C. § 846, one count of aiding and abetting in a murder during and in relation to a drug trafficking crime in violation of 18 U.S.C. §§ 924(c) and (i), and one count of drug related murder conspiracy. Plea Agreement, ECF No. 65; J., ECF No. 252. Waller faced a statutory sentencing range of 10 years to life on the first count; a mandatory term of any term of years or for life on the second count, to be served consecutively to any other term of imprisonment (the same sentence Milton faced on Count Four), and a maximum term of 5 years on the third count. PSR, ECF No. 354 ¶ 61. Based on his total offense level of 42 and criminal history category of VI, Waller's guidelines sentencing range was 360 months to life. Id. ¶ 62. Waller was sentenced to

a total of 320 months on the first count, 120 months on the second count, and 60 months on the third count, all to run concurrently. J., ECF No. 252 at 1–2.[12]

Clearly, there is a disparity between the life sentence that Milton received and the 320-month sentence Waller received. But the question remains whether the disparity is unwarranted.

Waller pled guilty to participating in the drug conspiracy, aiding and abetting in a murder during and in relation to a drug trafficking crime, and conspiracy in the actions that led to Byron-Cox's death. Superseding Indictment, ECF No. 50; J., ECF No. 252. Milton was found guilty by a jury of participating in the drug conspiracy, interfering with commerce by threat or murder, and robbery related murder. J., ECF No. 197. The jury was instructed that he could be found guilty of robbery related murder if they found that he knowingly used a firearm or aided and abetted the use of a firearm to kill Byron-Cox. Trial Tr., ECF No. 398-5 at 77–79. There is no affirmative finding by either the court or the jury as to who shot Byron-Cox, and Waller and Milton have always maintained that the other was the shooter. Given these very particular circumstances, where both defendants participated in the murder but there is no clear finding as to which one did the actual shooting, the disparity between their sentences appears to be unwarranted.

---

[12] It is unclear why the sentence on Waller's conviction for violation of § 924(i) was run concurrently with his other terms of imprisonment. As discussed, prior to Lora, courts in the Fourth Circuit ran the sentences consecutively to other terms of imprisonment. The language in the PSRs setting out statutory sentences for the § 924(i) conviction, including that any sentence be imposed consecutively to any other sentence, is identical. Compare Milton's PSR, ECF No. 456 ¶ 64 with Waller's PSR, ECF No. 354 ¶ 61. The difference may be attributable to a motion for substantial assistance the government filed on Waller's behalf that was granted by the court, ECF No. 250 and Oral Order of October 22, 1997, but the record offers no explanation.

Or course, sentences are based not only on the actions of the defendants at the time of the offense, but also on other factors adduced at sentencing. Looking at the PSRs for Milton and Waller, each had a base offense level of 43 based on USSG § 2D1.1, and each received a 2-level increase because the victim was restrained. Milton PSR, ECF No. 456 ¶ 27, 29; Waller PSR, ECF No. 354 ¶ 27, 29. Milton received a 2-level increase for his role as the organizer and leader of the murder element of the conspiracy and directing the actions or Waller and codefendant Yancey. Milton PSR, ECF No. 456 ¶ 30. Waller received a 3-level decrease for accepting responsibility, which Milton did not receive because he opted to go to trial. Milton PSR, ECF No. 456 ¶ 33; Waller PSR, ECF No. 354 ¶ 33. Milton's total offense level was 47 and Waller's was 42. Milton PSR, ECF No. 456 ¶ 34; Waller PSR, ECF No. 354 ¶ 36.

Milton had a subtotal criminal history score of 10 increased by two points because he was on parole at the time of the instant offense and increased by an additional point because the offense was committed within two years following his release on a robbery conviction. His 13 criminal history points put him in criminal history category VI. Milton PSR, ECF No. 456 ¶¶ 38–48. Two of Milton's previous convictions involved violence. When he was 18, he pointed a gun at a taxi driver and stole $35 cash. Id. ¶ 40. When he was 27, Milton was involved in a minor traffic accident and while exchanging information with the other driver, Milton jumped into the other driver's car. When the other driver attempted to pull Milton out of the car, Milton pointed a gun at him and then engaged in a high-speed chase trying to flee the police. Id. ¶ 44.

Waller had a criminal history score of 12, increased by 2 points because he was on parole at the time of the instant offense, and increased by 1 additional point because he

25

committed the instant offense within two years of being released from prison on a conviction of reckless endangerment. His total of 15 criminal history points landed him in criminal history category VI. Waller PSR, ECF No. 345 ¶¶ 39–51. Waller's previous offenses were non-violent, although when he was 20, he was driving a stolen car and led police on a high-speed chase, during which the police vehicle was rammed several times. Id. ¶ 47.

Based on their respective total offense levels and criminal history categories, Milton had a guidelines range of life, and Waller had a guidelines range of 360 months to life, with the difference attributable to their total offense levels. Milton PSR, ECF No. 456 ¶ 65; Waller PSR, ECF No. 354 ¶ 62. Despite Waller having a pre-Booker mandatory guidelines range of 360 months to life, he was sentenced to 320 months, presumably based on the substantial assistance motion filed by the government. See ECF No. 250 and Oral Order of October 22, 1997.

Milton's leadership role in the conspiracy warrants a longer sentence. And Waller was entitled to a shorter sentence based on his acceptance of responsibility and the assistance he provided to the government. There is a "well-recognized principle that defendants who plead guilty can be given the benefit of that cooperation as part of their Guidelines calculation and ultimate sentence, while defendants who exercise their right to a trial have no entitlement to the same benefit." United States v. Susi, 674 F.3d 278, 287–88 (4th Cir. 2012).

However, "an individual who ought to serve a longer sentence than their co-defendants can still face a sentence that is unfairly long." Wesley, 2025 WL 2623449 at *7. In Milton's case, the differences in the total offense levels and the resulting guidelines sentences warrant a difference in the sentences, but not the glaring disparity that resulted in this case—320

26

months for Waller and life for Milton. See Johnson, 143 F.4th at 215–16 (finding that the district court did not abuse its discretion when it determined that cooperation with the government by two codefendants did not justify the vast disparity between their sentences, 20 years and 40 years, respectively, with that of the defendant, who was sentenced to two life terms plus 790 months for similar same conduct).

The court here finds that the vast disparity between the life sentence Milton received and the 320-month sentence Waller received is unwarranted. To be sure, Milton should be punished more severely than Waller, but his life sentence, when compared to Waller's 320-month sentence, overstates the differences in their culpability and criminal histories. Accordingly, the court finds that the unwarranted disparity in the sentences is an extraordinary and compelling reason that merits a sentence reduction.

### (6) Rehabilitation

Finally, Milton argues that his rehabilitation while in prison offers an additional reason for a sentence reduction. The policy statement addressing the role of rehabilitation in determining whether an extraordinary and compelling reason for a sentence reduction exists sets forth the following:

> Pursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement. However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted.

USSG § 1B1.13(d).

27

Turning first to Milton's institutional record, from 2001 through 2015, Milton had seven disciplinary infractions, with three charges of "phone abuse," one charge of possessing an unauthorized item, two charges of disruptive conduct, and one charge of assault without serious injury. ECF No. 463-2 at 29. The punishments given by the prison staff for the various infractions included loss of commissary, visitation, e-mail, and phone privileges, and loss of a maximum of 27 days of good conduct time. Id. at 29–32. From September 2015 through January 29, 2024, a period of more than eight years, Milton had one additional disciplinary infraction on February 9, 2023, for "disruptive conduct-high" for which he lost commissary privileges but was not otherwise disciplined. Id. at 29. While his disciplinary record is not perfect, having only eight disciplinary infractions in 30 years of incarceration, with only one of those in the last 10 years of incarceration, is powerful evidence of meaningful rehabilitation.

Milton also submitted letters, comments, and commendations from prison staff which he has received during his incarceration. In a letter dated August 12, 2008, the supervisor of recreation at United States Penitentiary Allenwood stated that Milton had worked for the recreation department for six years. The supervisor said that he had not had an employee "more organized, dedicated, and committed to completing his tasks on a daily basis" than Milton. ECF No. 463-2 at 35. At one point Milton planned and scheduled all movies and entertainment within the institution, and he insured that all information relevant to the recreation department was given to the housing unit officers and posted for the inmates to view. Milton assisted in organizing and running holiday tournaments, compiled statistics for inmate surveys, assisted in running the recreation pre-release program for the institution, was certified as a spinning instructor and fitness instructor/personal trainer, and led spinning

classes. The supervisor said that Milton strove to improve himself and others in many ways
and was a valuable employee at the institution. Id.

In an undated memorandum, a teacher at Federal Correctional Complex Beaumont
described Milton as a "great asset to staff" at the facility. He had completed several classes,
encouraged other inmates to participate in programming, was respected by his peers, was
always on time, and never complained about working. The teacher said he could see Milton
adjusting well to society because he is a great listener and quick learner. The teacher concluded,
"Inmate Milton has discipline and is able to transition back into society." Id. at 37.

In a September 18, 2020, memorandum, the supervisor of education at Federal
Correctional Institution (FCI) Ray Brook described Milton as "a dedicated and conscientious
employee going above and beyond to ensure tasks are completed timely and accurately." The
supervisor added that he had observed many of Milton's qualities and skills and felt confident
in his assessment of Milton's potential for success in future work settings. Id. at 38.

Milton's Summary Reentry Plan—Progress Report, dated July 8, 2024, included a
comment provided by a drug treatment specialist that describes Milton as a positive asset to
FCI Otisville and states that Milton was instrumental in setting up the Inmate Lifers' Program.
He also was described as a "huge leader" in starting the Alcoholics Anonymous/Narcotics
Anonymous program at FCI Otisville after it had been dormant for several years. While Milton
worked in the medical department, he was recognized for helping every department when
called upon. ECF No. 472-1 at 4. Other FCI Otisville staff members commented that Milton
"exhibits a positive attitude, respectful demeanor, and an outstanding work ethic," "is
dedicated to improving himself by completing programs that are available to him," "is a very

29

hard worker," "is very helpful and has a no questions asked mentality when something needs to be completed," was seen as possessing "the skills and confidence for a successful future," and had worked "to develop useful abilities in order to acquire and maintain post incarceration employment." Id. at 5. Milton was considered to have a low risk of recidivism. Id. at 2.

Milton has taken a great variety of classes while incarcerated. Id. at 2-3; ECF No. 479-1 at 31–33. He also participates in a program designed to provide participants with job training and skills necessary in the specific labor markets in which they live, which in Milton's case will be New York, upon approval of his reentry plan. See ECF No. 479-1 at 39–51. The reentry affairs coordinator for FCI Otisville stated that Milton is the vice-president of the Lifers' Program at the facility, co-chaired the victim impact program, and was a "driving force" behind the implementation of the stop the violence ACE program curriculum. She concluded that she, the education department, and the Department of Labor were all appreciative "of the vital service Mr. Milton provides." ECF No. 480.

In addition to letters from prison staff, Milton submitted multiple letters from his family, fellow inmates, and former inmates, all attesting to his good character and to the positive impact he has had on their lives. Many of the letters contained offers of support, including making jobs available to Milton, should he be released from custody. See ECF Nos. 463-2 at 45–63, 67–84, 88–100; 473, 474, 477, 478.

The efforts Milton has made at rehabilitation are particularly remarkable considering that for most of his incarceration he faced three life sentences and since 2021 has continued to face a life sentence. That Milton has sought continuously to improve himself, inspire fellow inmates and people living outside the prison, serve the facilities where he has been

incarcerated, and nurture his family relationships, is very impressive. While his rehabilitation alone is insufficient to warrant a sentence reduction, when considered with the other factors set forth above, it weighs in favor of a sentence reduction.

In sum, Milton has shown that there exist extraordinary and compelling reasons to reduce his sentence. At the time he was sentenced, the court was obligated to impose a consecutive term of life imprisonment on Count Four. Such a sentence is no longer mandatory, and it is likely that he would receive a shorter sentence if he were sentenced today. In addition, careful consideration of the record indicates that there is an unwarranted disparity between his sentence and that of his codefendant Waller. These factors, when considered together with the evidence of Milton's significant rehabilitation, lead the court to conclude that a sentence reduction is appropriate under 18 U.S.C. § 3582(c)(1)(A).

### C. 18 U.S.C. § 3553(a) Factors

Having found that extraordinary and compelling reasons exist for a sentence reduction, the court "must 'consider[]' the § 3553(a) sentencing factors 'to the extent that they are applicable' in deciding whether to exercise its discretion to reduce the defendant's term of imprisonment." United States v. High, 997 F.3d 181, 186 (4th Cir. 2021) (quoting 18 U.S.C. § 3582(c)(1)(A)). The factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

(i) issued by the Sentencing Commission pursuant to section 994(a)(1) of Title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; . . . .

(5) any pertinent policy statement –

(A) issued by the Sentencing Commission pursuant to section 994(a)(2) of Title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(B) that, except as provided in § 3742(g), is in effect on the date the defendant is sentenced[;]

(6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

Looking first at the nature and circumstances of the offense, Milton participated in a heinous murder over drug crime proceeds. While he has maintained for the last 30 years that he did not pull the trigger, the jury convicted him of acting as a principal and/or aider or abettor in the murder. It is uncontested that the victim, Byron-Cox, was bound, beaten, and

32

shot in the back and that Milton was a willing participant in the vicious scheme. Byron-Cox's mother and sister stated that the family was devastated by his death. PSR, ECF No. 456 ¶ 22. In addition, the victim's girlfriend was bound and present while the victim was beaten and shot. Also, Milton transported crack cocaine from New York and sold it on the streets of Waynesboro, Virginia and the court is familiar with the devastation wrought by the crack cocaine epidemic. The nature and circumstances of this offense weigh heavily against a sentence reduction.

Turning to the history and characteristics of the defendant, Milton's criminal history as an adult includes forcible theft with a deadly weapon at age 18, two burglaries when he was 19, and forcible theft with a deadly weapon when he was 27. Id. ¶¶ 40, 41, 44. His other convictions were for non-violent offenses. Milton used marijuana weekly from the age of 11 and used cocaine socially from 1987 until January 1995. Id. ¶ 59. Milton dropped out of high school in the tenth grade but later obtained his GED while incarcerated. Id. ¶ 60.

Milton is now 62 years old and has spent the last 30 years incarcerated. As set forth above, Milton's institutional record is mostly positive. He has been found guilty of eight disciplinary infractions in 30 years, with only one of those occurring in approximately the last eight years. He has taken many classes, maintained employment while incarcerated, and volunteered to lead positive social groups. He is considered a low risk for recidivism but is still considered a medium security level inmate. Summary Reentry Plan, ECF No. 472-1 at 1–2. While he clearly was a violent man when he was younger, he has no recent history of violence or disruptive behavior.  In addition, he has put forth considerable effort into encouraging his

fellow inmates to improve their lives both in and out of prison. The court finds that taken as a whole, Milton's history and characteristics weigh in favor of a sentence reduction.

Looking next at the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner, the court finds that a sentence of 470 months is sufficient to meet these goals. Such a sentence is substantial, and the court does not believe that additional time is necessary to achieve the punitive and deterrent goals of punishment. Nor does the court find that additional time is necessary to provide Milton with educational or vocational training, medical care, or other correctional treatment.

Looking at the kinds of sentences available and the applicable guidelines range, as set forth above, Milton would face a statutory maximum sentence of life or death for his offense if he were sentenced today and the court would have discretion to impose the sentence concurrently or consecutively to his other sentences. 18 U.S.C. § 924(j)(1). His guidelines range would be life. PSR, ECF No. 456 ¶¶ 27, 65. This factor is neutral with regard to lowering Milton's sentence. As discussed, while the court could still impose a consecutive life sentence, it would not be appropriate today given Milton's maturity and institutional record. Regarding consideration of pertinent policy statements, reducing Milton's sentence to 470 months is consistent with USSG §§ 1B1.13(b)(6) and (d).

The court addressed the need to avoid unwarranted sentencing disparities above. A sentence of 470 months, compared to Waller's 320-month sentence, reflects that Milton was

a leader in the murder element of the conspiracy and gives Waller credit for accepting responsibility and for the assistance he provided to the government, without creating an unwarranted sentencing disparity. When the relevant § 3553(a) factors are considered together, they support a finding that Milton is entitled to a sentence reduction.

The court does not come to its decision to reduce Milton's sentence lightly. Byron-Cox was brutally murdered and both Waller and Milton deserved to be severely punished for his murder. However, for all the reasons stated above, the court finds that reducing Milton's sentence from life to 470 months better serves the interest of justice.

Nor does the court make the decision in a vacuum. Other courts have reduced life sentences based on extraordinary and compelling reasons and the § 3553(a) factors when defendants have shown strong evidence of rehabilitation. For example, in Wesley, 2025 WL 2623449, at *13, the court reduced the defendant's life sentence to 480 months after finding that an unwarranted sentencing disparity and the § 3553(a) factors supported the reduction. In United States v. Gallego, No. 95-cr-0284 (LAK), 2025 WL 723237 (S.D.N.Y. Mar. 6, 2025), the court reduced a life sentence for murder to 430 months based on the defendant's noteworthy rehabilitation, his service to others while incarcerated, and his relative youth, 23 years old, at the time of the murder. The court found that the defendant's youth alone was not extraordinary, but when considered with evidence that his older brother pressured him into committing the murder, and with his rehabilitation and commitment to service, the totality of the circumstances presented extraordinary and compelling reasons for a sentence reduction.

In United States v. Fleming, No. ELH-08-086, 2022 WL 743955 (D. Md. Mar. 11, 2022), the court found that the defendant showed an extraordinary and compelling reason for

a sentence reduction and reduced his sentence of two life terms plus 240 months to 360 months after considering the § 3553(a) factors. The court emphasized the defendant's post-sentencing conduct, his remorse, and letters from relatives and friends who attested to his maturity and acceptance of responsibility while incarcerated. See also United States v. Espino, No. 03-20052-08-JWL, 2022 WL 4465096 (D. Kan. Sept. 26, 2022) (reducing a life sentence for murder to 360 months based on defendant's youth at the time he committed the murder, the sheer length of the sentence, multiple letters from prison staff and family attesting to his rehabilitation and good character, and his prison disciplinary record); United States v. Felton, 587 F. Supp.3d 366, 373–75 (W.D. Va. Feb. 23, 2022) (Moon, J.) (reducing sentence of two life terms plus 120 months to 360 months based on § 3553(a) factors); United States v. Jones, No. 3:99-cr-264-1 (VAB), 2020 WL 2791862 (D. Conn. May 29, 2020) (reducing four concurrent life sentences to 450 months after considering the § 3553(a) factors; Carter v. United States, No. ELH-00-0100, 2020 WL 1914766 (D. Md. Apr. 17, 2020) (reducing term of life plus 30 years to 35 years after considering § 3553(a) factors).

After considering the parties' arguments and the applicable § 3553(a) factors, the court concludes that a sentence reduction is warranted in Milton's case. Given the circumstances of this case, including the change in the mandatory nature of the life sentence assessed on Count Four in 1996, the unwarranted sentencing disparity with his codefendant, evidence of Milton's growth and rehabilitation while incarcerated, and his commitment to service both inside and outside of prison, the court concludes that a sentence of 470 months is appropriate. Such a sentence is sufficient, but not greater than necessary, to reflect the seriousness of Milton's

conduct and criminal history, promote respect for the law, provide just punishment, afford specific and general deterrence, and protect the public.

### III. Conclusion

For the above-stated reasons, the court will **GRANT** Milton's motion for compassionate release, ECF No. 463, and reduce his sentence to 470 months, to be followed by a 5-year term of supervised release. All other terms and conditions of the revised judgment entered on April 20, 2021, remain in effect. The clerk is directed to send a copy of this memorandum opinion and accompanying order to the petitioner, his counsel of record, and the United States.

An appropriate order will be entered.

It is so **ORDERED**.

Entered:    November 12, 2025

Michael F. Urbanski
U.S. District Judge
2025.11.12 14:43:38
-05'00'

Michael F. Urbanski
Senior United States District Judge